## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

United States Board of Oral Implantology; and
International Congress of Oral Implantologists,

*Plaintiffs*,

v.

American Board of Dental Specialties;
American Board of Oral Implantology (Implant
Dentistry); American Academy of Implant
Dentistry; Cheryl Parker; Kevin O'Grady;
Jaime Lozada; Kim Gowey; Michael Mashni;
and John Does 1-50,

*Defendants.*

Case No. 1:18-cv-06520

**JURY TRIAL DEMANDED**

### COMPLAINT

Plaintiffs United States Board of Oral Implantology (the "USBOI") and International Congress of Oral Implantologists (the "ICOI") (together, "Plaintiffs"), in support of their Complaint against Defendants American Board of Dental Specialties (the "ABDS"); American Board of Oral Implantology (Implant Dentistry) (the "ABOI"); American Academy of Implant Dentistry (the "AAID"); Cheryl Parker; Kevin O'Grady; Jaime Lozada; Kim Gowey; Michael Mashni; and John Does 1-50 (collectively, "Defendants"), hereby allege as follows:

### INTRODUCTION

1.      This action arises from a longstanding, clandestine plan by Defendants (including those whose identities are not yet known to Plaintiffs) to enrich themselves by monopolizing the ability to confer specialist certifications in the field of oral implantology, foreclosing competition and permitting Defendants to set prices for a range of required services, courses, memberships, and professional materials above competitive levels. As more fully explained below, Defendants

engaged in a multi-year, deceptive scheme—effected through litigation; false and misleading statements to government officials, the dental community, and the public; and the creation of a front organization that cynically held itself out as a neutral, objective arbiter—to ensure that only members of the AAID and ABOI could receive the coveted (and financially valuable) specialist certification.

2.      There are substantial benefits to being certified as a specialist in a particular field of dentistry.  Those benefits include the ability to advertise as a specialist; enhanced reputation and credibility, with both patients and other dentists who might refer patients; and the ability to charge appropriately higher fees for procedures and to be reimbursed in greater amounts by insurance companies.  The public benefits as well, because prospective patients—supposedly—can rely on the fact that "certified specialists" in fact bring superior skill and training to the work they perform.

3.      To avoid misleading the public or compromising the level of care afforded to patients, however, dentists cannot simply declare themselves "specialists."  Rather, as required by laws, regulations and licensing requirements in virtually every state, dentists who wish to hold themselves out as specialists (in oral implantology, for example) must be recognized as such by a professional organization generally referred to as a "specialty certifying board."

4.      In addition to meeting the criteria set by a specialty certifying board (such as the ABOI or the USBOI), dentists seeking recognition as "board certified" specialists typically also pay a fee to the certifying board and subsequent recertification fees.  Dental specialists also generally pay membership dues to their specialty certifying board and/or its sponsoring organization (such as the AAID or the ICOI) and participate in conferences and other educational opportunities offered by those entities.

5. Defendants here, cloaking themselves in the public interest and seeking to exploit the inaction of the American Dental Association (the "ADA"), conceived and now continue to engage in a conspiracy to obtain and preserve the ABOI's monopoly power over certifying dentists as specialists in oral implantology / implant dentistry (referred to herein as "oral implantology"). Defendants sought, unfairly and unlawfully, to preserve the ABOI's and the AAID's stranglehold on the United States market for services related to specialty certification in that field. (For present purposes, "oral implantology" can be defined as the field of dentistry dealing with the diagnosis, surgical placement, prosthetic reconstruction, and maintenance of dental implants.)

6. As further alleged below, Defendant ABDS is an organization that certifies prospective dental specialty certifying boards as qualified to certify dentists as specialists in particular dental fields. Defendant ABOI is one of the four specialty certifying boards that not only founded the ABDS but also remain the *only* specialty certifying boards *ever* approved by the ABDS. The ABOI was chartered in 1967 by Defendant AAID, a sponsoring organization that provides continuing education and training opportunities to its members, hosts member meetings and conferences, and publishes newsletters to update its members about developments in implant dentistry. Defendants Parker, O'Grady, Lozada, Gowey, Mashni, and others (the "Individual Defendants") play various senior roles at the ABDS, ABOI, and/or AAID, and have directed, facilitated and/or engaged in the wrongful conduct alleged.

7. Plaintiff USBOI was formed in 2017 by a group of experienced oral implantologists and educators. Sponsored by Plaintiff ICOI, the USBOI seeks to be a specialty certifying board for American dentists in the field of oral implantology. The ICOI is one of the world's largest dental implant organizations and providers of continuing dental implant education. It was founded in 1972 in Paris, France to provide continuing education in oral implantology. The

ICOI has approximately 9,900 members in 50 states and 93 countries.

8.     Defendants established the ABDS as the sole organization enabled to authorize other entities to certify specialists in oral implantology, and have actively and improperly manipulated the ABDS application process to prevent Plaintiff USBOI from becoming an ABDS-approved specialty certifying board in oral implantology.  In simple terms:  The prospective monopolists duped a number of states and thousands of dentists into believing that their shill organization (the ABDS) would operate as a neutral, objective and professional arbiter of prospective specialty-certifying entities, when all along the intention was for it to be nothing more than an instrument of monopoly maintenance and destruction of competition.

9.     Specifically, Defendants conspired to prevent the USBOI from entering two relevant markets:  the market for certifying dentists as oral implantology specialists in the United States, and the market to provide the professional services associated with such certifications (*e.g.*, continuing education courses, journal and other publication subscriptions, and conferences). (Where appropriate, Plaintiffs refer to the two markets jointly as the "Implantology Specialty Markets.")  Defendants' conspiracy has caused the USBOI and ICOI to lose members and fees associated with such certifications and ancillary services, and will continue to do so absent equitable relief.

10.     There should be no doubt about the posture or intentions of Plaintiffs:  Plaintiffs do *not* seek to prevent the ABOI from offering its services, and do not even (at least based on current knowledge) challenge the ABOI's qualifications or *bona fides* to serve as specialty-certifying board.  Plaintiffs seek only the ability to compete fairly, on the merits, and in the interests of dentists and their patients.

**Defendants' Scheme To Monopolize the Implantology Specialty Markets**

11.     The practice of dentistry is regulated by state administrative agencies known as state dental boards.  Historically, many of these state dental boards have delegated to the ADA the power to:  (i) determine which fields of dentistry qualify as specialties, and (ii) authorize specialty certifying boards to certify dentists as specialists within a given field.

12.     Ostensibly because the ADA has long delayed recognizing oral implantology as a specialty, but in fact because they saw an opportunity to foreclose prospective competition and create and maintain an unlawful monopoly, Defendants filed or caused to be filed administrative petitions and lawsuits around the country to have the ABDS recognized as a dental specialty board certifying organization.

13.     Upon information and belief, Defendants ABDS, ABOI, and AAID, acting at the behest of and through the authority of the Individual Defendants, have attempted to have state dental regulations changed in at least ten states so that dentists certified as specialists by specialty certifying boards approved by the ABDS can announce themselves to the public as dental specialists.  Upon further information and belief, as a result of Defendants' efforts, dentists approved by ABDS-approved specialty certifying Member Boards are no longer prohibited from holding themselves out as specialists in at least six states (Florida, California, New Jersey, Ohio, Indiana, and Texas).

14.     Defendants ABDS, ABOI, and AAID claimed in petitions and court filings, and, upon information and belief, in numerous oral and ancillary written representations and communications, that the ABDS would be neutral and impartial with respect to the recognition of specialties and specialty certifying boards.

15.     In reality, the ABDS has been anything but neutral and impartial.  To the contrary,

it has served as the engine for the maintenance of an unlawfully-obtained monopoly: It serves *only* the ABOI's and AAID's interests by using corruptly-garnered authority to prevent the USBOI from entering the market for oral implantology specialist certification and preventing the USBOI and ICOI from competing fairly in the market for ancillary services offered to oral implantology specialists in the United States. The prevarications of the ABDS, and its corporate and individual sponsors and controlling persons, have been revealed through a series of actions targeting the USBOI.

### The USBOI Seeks To Compete; the Scheme Is Revealed

16.     On or about January 22, 2018, the USBOI submitted an application to the ABDS to become a specialty certifying board (also known as a "Member Board") in oral implantology. Without such approval, the USBOI's certification is of limited value to oral implantologists because it does not enable them legally to hold themselves out as specialists in the field. Accordingly, without the ABDS' approval, the USBOI will be unable to attract members, candidates for certification, or consumers for the related and ancillary products and services offered by the USBOI and the ICOI.

17.     As of the beginning of 2018, the ABDS had published on its website an application and set of instructions for approval as specialty certifying board. The USBOI duly completed an application to become an ABDS Member Board based on the ABDS Application Instructions publicly accessible via the ABDS's website until at least February 22, 2018 (the "Original ABDS Application Instructions"). The Original ABDS Application Instructions were, upon information and belief, consistent with representations made to various state and other government entities, courts, and a variety of licensing boards in connection with ABDS being granted the privilege and mandate to serve as an entity empowered to certify specialty-certifying entities.

6

18.     The application that the USBOI submitted in January 2018 satisfied *all* of ABDS' published requirements for recognition as a Member Board (including payment of a hefty application fee), and ABDS had no reasonable, objective, or lawful basis to deny the application.

19.     There was one big problem:  approving the application would create competition for the ABDS' undisclosed puppet-masters, the ABOI and AAID.

20.     So, the ABDS  arbitrarily changed the rules, solely to preserve the monopoly corruptly obtained by its hidden controllers and to continue a pattern of deceptive conduct:  A month after the USBOI submitted its application, the ABDS abruptly asserted that it was changing the application requirements and that it would not consider the USBOI's application until some unspecified future date when a "new" application would be published.  (The ABDS apparently recognized that keeping the application fee would be even more provocative than merely dissembling about the application process; it returned the USBOI's check.)

21.     Surprised at this turn of events, which was utterly inconsistent with everything the ABDS had said about its *bona fides* and prospective operations *before* it obtained its plenary authority to approve specialty certification boards, the USBOI repeatedly requested, in writing, that the ABDS provide it with updated application instructions so that the USBOI could resubmit its application.  Each time, the ABDS, acting through Defendant Cheryl Parker, waited as long as it could, and then breezily contrived a false excuse for further delay.  Delay meant more money for the AAID and ABOI, and always maintained the prospect that the USBOI would simply go away, with competition indefinitely foreclosed.

22.     After *six months*, the ABDS finally provided updated application instructions on August 24, 2018 (the "Revised ABDS Application Instructions").

23.     Any suggestion that the delay was associated with a valid, public-spirited purpose

is belied by the fact that the Revised ABDS Application Instructions are only marginally different than the Original ABDS Application instructions in terms of the substantive requirements for recognition as a specialty certifying board. The anticompetitive purpose of the new application regime is, by contrast, made clear by the fact that the Revised ABDS Application Instructions *do* differ in two procedural respects.

24. First, the Revised ABDS Application Instructions specify for the first time that the ABDS will not make a final determination on applications *until the Winter Meeting following the February 1, 2019 application submission deadline*. As the Revised ABDS Application Instructions further provide, that means applications will not *even be considered until January 2020*. Thus, the ABDS, by withdrawing its application instructions after receiving the USBOI materials, taking a half-year basically to copy the existing instructions, and creating an unreasonable new schedule, ensured that it would not consider the USBOI's application until *two years* after it was first submitted.

25. Second, the Revised ABDS Application Instructions do not provide for any meaningful appeal of the ABDS' decision to deny an application. Unlike the Original ABDS Application Instructions, the Revised ABDS Application Instructions specify that any appeal is "limited in scope to review of procedural issues" and will not consider any additional facts or submissions aimed to cure identified deficiencies in an initial application. The Revised ABDS Application Instructions further provide that a denied applicant may reapply only after *another full year* has elapsed—*with the clock running from the end of the appeal process, which is not itself time-limited*. Thus, the ABDS has effectively not only insulated its decisions from review, it has also created a process that essentially ensures its ability to perpetually protect the ABOI's status as the sole specialty certifying board in oral implantology.

26.     Without being approved by the ABDS as a specialty certifying Member Board, the USBOI cannot enter the Implantology Specialty Markets because it cannot compete to attract members, or to provide professional services associated with such certifications (*e.g.*, continuing education courses, journal and other publication subscriptions, and conferences).   Plaintiffs, therefore, are directly harmed by Defendants' conduct because they cannot collect membership dues, certification and re-certification fees, application fees, or revenue associated with providing continuing education, journals and other publications, and conferences.

## PARTIES

27.     Plaintiff USBOI is a non-profit corporation organized under the laws of New Jersey.  It was formed for the purpose of credentialing specialist dentists in the United States in the field of oral implantology and providing related services.  The USBOI's principal place of business is 55 Lane Road, Suite 3, Fairfield, New Jersey 07004.  Its current president is Francis R. DeLuca, DMD, JD.

28.     Plaintiff ICOI is a non-profit corporation organized under the laws of Washington, D.C.  The ICOI was formed for the purposes of supplying dental implantologists with high quality education to better serve their patients.  Kenneth W.M. Judy, DDS is the Director, Co-Chairman and CEO of the ICOI and has led the organization since 1979.

29.     Defendant ABDS is an organization that certifies other organizations, known as dental specialty boards, to provide credentials to dentists as specialists in particular dental fields. The ABDS is an Illinois corporation with its principal place of business at 211 East Chicago Avenue, Suite 750C, Chicago, Illinois 60611.

30.     Defendant ABOI is a credentialing organization that certifies specialist dentists in the field of oral implantology.   The ABOI provides continuing education, including through

courses and hosting member meetings and conferences, and publishes newsletters and journals. The ABOI was one of the founders of the ABDS, and is recognized by the ABDS as the only specialty certifying board in oral implantology. The ABOI is the specialty certifying board component of the AAID, which chartered the ABOI in 1967. The ABOI is an Illinois corporation with its principal place of business at 211 East Chicago Avenue, Suite 750, Chicago, Illinois 60611.

31.     Defendant AAID provides continuing education and training opportunities to its members, hosts member meetings and conferences, and publishes newsletters to update its members regarding developments in implant dentistry. The AAID chartered the ABOI to act as its specialty certifying board branch. The AAID is an Illinois corporation with its principal place of business at 211 East Chicago Avenue, Suite 750B, Chicago, Illinois 60611.

32.     To make clear what the foregoing paragraphs note: the ABDS, ABOI and AAID share office space (and as further explained below, personnel and leadership). These facts belie the independence and objectivity of ABDS just as much as they enhance the efficiency and effectiveness of the conspiratorial scheme.

33.     Defendant Cheryl Parker ("Parker") is the Executive Director of both the ABDS and the AAID. Upon information and belief, Parker resides in Illinois. Upon information and belief, Parker directed the conduct of Defendants ABDS and AAID.

34.     Defendant Dr. Kevin O'Grady ("O'Grady") is the President of the ABOI, former President of the AAID, and former President of the ABDS. Upon information and belief, O'Grady resides in Ohio. Upon information and belief, O'Grady directed the conduct of Defendants ABDS, ABOI and AAID.

35.     Defendant Dr. Kim Gowey ("Gowey") is a Director of the ABOI and the Secretary

of the ABDS. Upon information and belief, Gowey resides in Wisconsin. Upon information and belief, Gowey directed the conduct of Defendants ABOI and ABDS.

36.     Defendant Dr. Jaime Lozada ("Lozada") is the Vice President of the ABOI, former President of the AAID, Treasurer of ABDS, and former President of the ABDS. Upon information and belief, Lozada resides in California. Upon information and belief, Lozada directed the conduct of Defendants ABDS ABOI, and AAID.

37.     Defendant Dr. Michael Mashni ("Mashni") is the President of the ABDS. Upon information and belief, Mashni resides in California. Upon information and belief, Mashni directed the conduct of Defendant ABDS.

38.     Upon information and belief, Defendants John Does 1-50, whose identities and roles will be developed through discovery and Plaintiffs' independent investigations, are additional individuals who have conspired with the other Defendants to suppress competition in the Implantology Specialty Markets, and to direct the conduct of Defendants ABDS, ABOI, and/or AAID.

## JURISDICTION AND VENUE

39.     This action arises under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2, and is instituted under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages and the costs of this suit, including reasonable attorneys' fees, and to enjoin the ongoing conspiracy and other violation of the antitrust laws.

40.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331, 1337, and Sections 4 and 16 of the Clayton Act. This Court has original and/or supplemental jurisdiction over Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367. This Court also has diversity jurisdiction over this action, pursuant to 28 U.S.C. § 1332, because the matter in controversy exceeds the sum or value

of $75,000 exclusive of interest or costs, and is between citizens of different states.

41.     Venue is proper in this District under 28 U.S.C. § 1391(b).

## FACTUAL BACKGROUND

### I.      History of the ICOI and USBOI

42.     The ICOI is one of the world's largest dental implant organizations and providers of continuing dental implant education.  It was founded in 1972 to provide continuing education in oral implantology.  It has approximately 9,900 members in 50 states and 93 countries.

43.     The ICOI holds an annual meeting called the World Congress, as well as other smaller continuing education meetings in the United States and internationally;  since 1972, the ICOI has held meetings in locations as diverse as Buenos Aires, Paris, and Tokyo.  The ICOI also publishes a journal, and conducts continuing education courses in both a live classroom setting and through the Internet.

44.     The ICOI offers oral implantologists three levels of certification:  (i) Fellowship; (ii)  Mastership, and (iii) Diplomate.  To be certified by the ICOI, an implantologist must fulfill various continuing education requirements, including, among other things, completing case studies, publishing articles, and attending educational meetings.   Each subsequent level of certification has increasingly stringent requirements (*i.e.*, it is more difficult to be certified for Mastership than it is to be certified for a Fellowship, and it is more difficult to be certified as a Diplomate than it is to be certified for a Mastership).  The ICOI collects revenue from membership fees, certification fees, recertification fees, continuing education courses, journal and other publication subscriptions, and conferences.

45.     In February 2017, the ICOI agreed to be the sponsoring organization for the USBOI.  The USBOI was formed by a group of experienced oral implantologists and educators to

be a specialty certifying board in the field of oral implantology that could certify U.S. dentists who satisfy certain educational and experiential requirements and complete requisite examinations as specialists in oral implantology. The USBOI's goals include organizing and improving oral implantology clinical research and educational standards, stressing the technique and science of oral implantology through global research and study, and improving the quality of oral implantology care. The USBOI's members would also join the ICOI and would have access to the ancillary services the ICOI offers.

46. The USBOI has a rigorous process for an oral implantologist to be certified as a specialist or "diplomate." Applicants must: (i) be active ICOI members; (ii) have five or more years of experience in the practice of implant dentistry; (iii) have completed 120 cases of implant-related treatment; (iv) have completed 250 continuing education hours in the preceding five years; (v) either have authored at least one article or case report in the field of implant dentistry or presented at least two lectures or tabletop presentations at implant meetings within the past five years; (vi) provide letters of recommendation from two ICOI "diplomates" or members of the USBOI's Advanced Credentials Committee; (vii) complete written and oral examinations; and (viii) pay a $1000 examination fee.

47. Certification as a USBOI diplomate is valid for five years, after which diplomates must complete a recertification examination to maintain diplomate status. To be re-certified, a diplomate must also complete a statement of intent to recertify and a continuing education attestation statement that confirms that the diplomate has completed 150 hours of continuing education in the preceding five years, and pay an additional $500. Diplomates must also attend at least one USBOI sponsored or co-sponsored meeting every three years. USBOI's bylaws require members to pay an annual registration fee. Upon information and belief, these USBOI

requirements are similar or identical to the requirements of ABDS-approved Member Boards.

## II.    History of Dental Specialties and Certifying Organizations

48.    Simply because a dentist has been certified by a specialty certifying board does not mean the dentist is permitted to announce, promote, or advertise herself as a "specialist."  The rules regarding who lawfully may hold oneself out as a dental specialist are issued by state dental boards, which are authorized by states to govern the qualifications for and practice of dentistry within a state.  A state dental board's authority is defined by state law, but typically includes (i) establishment of qualifications for licensure; (ii) issuance of licenses to qualified individuals; (iii) establishment of standards of practice and conduct; (iv) taking disciplinary action against those who engage in misconduct, and (v) promulgation of rules to enable the board to perform its duties.

49.    Historically, many state dental boards have delegated the discretion to determine which fields of dentistry qualified as specialties to the ADA, a professional association of dentists established in 1859.  Many state regulations prohibited anyone from holding herself out as a dental specialist unless that person was certified as a specialist by a specialty certifying board approved by the ADA.

50.    The ADA recognized dental specialties for the first time in 1947, when it recognized five.  In the 70 years since, it has recognized only four additional specialties.  It has not recognized any new specialty in this century.   The nine dental specialties the ADA currently recognizes are:  (1) Dental Public Health; (2) Endodontics; (3) Oral and Maxillofacial Pathology; (4) Oral and Maxillofacial Radiology; (5) Oral and Maxillofacial Surgery; (6) Orthodontics and Dentofacial Orthopedics; (7) Pediatric Dentistry; (8) Periodontics; and (9) Prosthodontics.

51.    Dentists who were experts in areas other than those nine fields recognized by the

14

ADA (*e.g.*, oral implantologists), could not refer to themselves as specialists. This was significant to them for at least two reasons: (1) they could not advertise to potential patients or other members of the dental industry as specialists; and (2) because their areas of expertise we not considered "specialties," the procedures these dentists performed could not be classified as specialty procedures for billing and dental insurance reimbursement purposes.

52.     In the mid-1970s, the ICOI submitted an application to the ADA for recognition of oral implantology as a specialty. As part of the process, Dr. Judy and others made presentations to the ADA's Council on Dental Education. Subsequently, the ADA informed the ICOI that it had satisfied all requirements for implantology to be recognized as a specialty except one, which required that a field would not be recognized as a specialty if it could be "subsumed" into an existing ADA-recognized specialty. However, implantology simply did not—and does not—fit into any then-existing ADA specialty. Upon information and belief, between 1986 and 2012, other professional organizations also submitted applications to the ADA to recognize three additional dental specialties: (i) Oral Medicine; (ii) Oral Facial Pain; and (iii) Dental Anesthesiology.

53.     The ADA rejected each of these applications, in decisions widely criticized within the profession. The principal basis for the criticism (and likely to be a matter on which Plaintiffs and Defendants broadly agree) is that the decisions were motivated not by valid, neutral and objective criteria, but to protect the economic interests of existing specialists from potential competition from other dentistry disciplines that could also be recognized as specialties.

54.     Unfortunately, as summarized above and further alleged below, Defendants decided to learn from the ADA's unfortunate behavior; indeed, Defendants amplified it in ways that violate the federal antitrust laws.

III.   **The ABDS, ABOI, and AAID:  Conspirators with Common Leadership and Goals**

55.    In or around 2013, Defendant ABDS was formed by professional organizations in four dental fields not recognized as specialties by the ADA:  (i) Defendant ABOI; (ii) the American Board of Oral Medicine; (iii) the American Board of Orofacial Pain; and (iv) the American Dental Board of Anesthesiology.

56.    The ABDS was founded as a credentialing organization for dental specialty certifying boards seeking to certify dental practitioners in disciplines not recognized as specialties by the ADA.

57.    According to the ABDS website, it "is an independent organization of member dental specialty boards with shared goals and standards related to the certification of dental specialists."  *See* https://dentalspecialties.org/about-the-abds/.  Its stated mission is "to encourage the further development of the profession of Dentistry through independent recognition of specialty certifying boards, improve the quality of care, and ultimately protect the public."  *See id.* The ABDS further and falsely claims that it "is created and predicated on the principle that an organization, *independent of any trade association or self interest group, is required for the objective evaluation and determination of specialty areas in dentistry*."  *See id.* (emphasis supplied).

58.    The ABDS' claims (again falsely, as its treatment of Plaintiff USBOI makes manifest) that it will "provide a fair, equitable, and evidence-based process for evaluating and recognizing dental certifying boards, their certification requirements, and their respective areas of practice as specialty areas in Dentistry to allow an impartial mechanism for state regulators to recognize dental specialists."  *See* https://dentalspecialties.org/about-the-abds/.

59.    The dental specialty certifying boards approved by the ABDS, its Member Boards,

"consist of specialty examiners who are charged with the evaluation and certification of dental specialty candidates." *See* https://dentalspecialties.org/about-the-abds/. Member Boards assess dental specialty candidates by verifying that minimum training standards are satisfied, and evaluating the candidates' knowledge base and clinical decision-making, including through written and oral examinations. *See id.*

60. Despite the ABDS' claim that it is fair, objective, and independent, the *only* four Member Boards *ever* recognized by the ABDS are *the same* organizations that founded, and continue to dominate and control it: (i) Defendant ABOI; (ii) the American Board of Oral Medicine; (iii) the American Board of Oral Facial Pain; and (iv) the American Dental Board of Implant Dentistry. The ABOI, a founding member of the ABDS, is the only Member Board approved by the ABDS to certify specialists in oral implantology.

61. The ABDS is thus nothing more than a front and a shill that serves the narrow economic interests of its founding organizations and, for purposes relevant here, permitted the ABOI and AAID to unlawfully obtain and preserve a monopoly on the Implantology Specialty Markets.

62. Defendants operate, in effect, as a single enterprise with common actors and common goals.

      a. The ABDS, the ABOI, and the AAID all share the same headquarters at 211 East Chicago Avenue, Suite 750, Chicago, Illinois 60611.

      b. The ABDS, the ABOI, and the AAID share overlapping leadership, with Defendants O'Grady, Parker, Lozada, and Gowey playing prominent roles across the entities. For example, Defendant O'Grady is the President of the ABOI, former President of the AAID, and former President of the ABDS. Defendant Parker is

17

the Executive Director of both the ABDS and the AAID. Defendant Lozada is the Vice President of the ABOI, the Treasurer of the ABDS Board of Directors, and the former President of the ABDS. Defendant Gowey is a Director of the ABOI and the Secretary of the ABDS Board of Directors.

c. Frank Recker, DDS, J.D. ("Recker") is the general counsel of the AAID, and has represented all three organizations and made numerous (misleading) representations on their behalf.

d. Defendants have collectively engaged in a course of conduct to ensure that the ABOI is the only specialty board that can certify U.S. dentists as specialists in oral implantology.

**IV.** **Defendants Engaged in a Facially-Benign, but in fact, Illicit Campaign To Become a Dental Specialty Board Certifying Organization.**

63.     Beginning in or around 2010, the ABDS and its four Member Boards embarked on a campaign to have a range of state regulations amended or ruled illegal. Defendants' objective was to change the regulations so that states would permit certified dentists in areas other than the nine ADA-recognized specialties lawfully to hold themselves out themselves as specialists. However, the ABDS sought to keep the authority to recognize specialty certifying boards consolidated to only two organizations: the ADA and the ABDS. Defendants hoped to have state dental boards prohibit anyone from holding herself out as a dental specialist unless that person was certified as a specialist by a specialty certifying board approved by the ADA *or* ABDS. By doing so, Defendants could assure that all oral implantologists in the United States would seek certification only from the ABOI and pay for the services offered by the ABOI and the AAID, not those of actual or prospective competitors, notably the ICOI and now the USBOI.

64.     Upon information and belief, Defendants undertook these efforts in at least ten

states: California, Florida, Indiana, Iowa, Massachusetts, New Jersey, North Carolina, Ohio, Oregon, and Texas. In those states and elsewhere, Defendants made numerous representations that the ABDS would be independent and fair, and would promote competition.

65. For example, on March 2, 2017, Recker, on behalf of the ABDS, submitted a petition for rulemaking to the New Jersey State Board of Dentistry to amend the New Jersey Administrative Code ("NJAC") 13:30-6.1, which regulates the ability of a dentist to "announce a dental specialty." The ABDS petition proposed amending NJAC 13:30-6.1(c)-(d) to, *inter alia*, add oral implantology as a recognized dental specialty, and to recognize that dentists can advertise as specialists if they are certified by a specialty board recognized by either the ADA or the ABDS.

66. In its petition, the ABDS asserted that, because the New Jersey regulation permitted dentists to hold themselves out as specialists only if they were certified by a specialty board recognized by the ADA (but not the ABDS), it had an "anti-competitive effect, restrains competition, injures consumers, negatively effects the dental 'marketplace,' and thus potentially violates federal antitrust law."

67. Defendants' subsequent behavior with regard to Plaintiffs makes those words both ironic and, perhaps unfortunately for Defendants, aptly applied to their own conduct toward Plaintiffs.

68. The ABDS petition further suggested that, unlike the ADA, it would be a neutral and impartial with respect to the recognition of specialties and specialty certifying boards.

69. Defendants have challenged other similar state regulations by filing lawsuits seeking to invalidate them. For example, on April 7, 2017, the AAID, represented by Recker, filed a complaint against the Indiana State Board of Dentistry and others in *Cooper v. Vaught*, No. 1:17-cv-1114 (S.D. Ind. 2017), alleging that Section 1-1-18(f) of Title 828 of the Indiana Administrative

Code ("Rule 1-1-18(f)"), which delegates regulatory authority of specialty advertising to the ADA, was illegal. Among other claims, the AAID alleged that Rule 1-1-18(f) was a restraint of trade in violation of Section 1 of the Sherman Act because it was "anticompetitive and works a distinct economic and financial harm to" the plaintiffs in that action, including AAID and its members. The AAID again suggested that, unlike the ADA, it (and its certifying board branch, the ABOI) were objective and impartial.

70.     On March 5, 2014, the AAID and the chartering organizations of the three other founding members of the ABDS, again represented by Recker, commenced an action in Texas— *Am. Academy of Implant Dentistry v. Parker*, No. 14-cv-191 (W.D. Tex. 2014)—against the Texas State Board of Dental Examiners and others. They alleged that Section 108.54 of the Texas Administrative Code ("Rule 108.54"), which delegates regulatory authority of specialty advertising to the ADA, was illegal. Among other claims, the AAID alleged that Rule 108.54 "deprives the individual Plaintiffs and members of the organizational Plaintiffs of any right to a neutral and impartial fact-finder, resulting in arbitrary and capricious decisions, in violation of Plaintiffs' due process rights, guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution." The ABDS founders and Member Boards again suggested that, unlike the ADA, they were neutral and impartial.

71.     The United States District Court for the Western District of Texas held that Rule 108.54 violated plaintiffs First Amendment right to freedom of speech. That decision was affirmed in *American Academy of Implant Dentistry v. Parker*, 860 F.3d 300 (5th Cir. 2017).

72.     Upon information and belief, as part of their effort to invalidate or amend regulations that prohibit dentists certified by ABDS-approved specialty certifying boards from announcing themselves as specialists, Defendants have made similar representations regarding

20

their purported neutrality, objectivity, and/or impartiality to state dental boards or courts in Oregon, North Carolina, Ohio, Massachusetts, and Iowa; and to courts in Florida, California, and Ohio. Upon information and belief, Defendants intend to suppress competition in the Implantology Specialty Markets throughout the United States by taking similar actions and making similar misrepresentations in additional states.

73. The ABDS has also engaged in a public relations effort as part of its campaign, and during that effort has repeated its claims of objectivity, independence and impartiality. For example, on February 9, 2016, during an interview for the blog "Dentist the Menace" [sic] with Dr. Michael Davis (a dentist in Santa Fe, New Mexico), Recker stated that "[t]he decisions of the ABDS relative to specialties will not consider competition, political decisions, or turf wars. *It will not be a decision made by a group of competitors who could be economically or politically affected by their own decisions*" (emphasis supplied). Recker knew this statement was false when made, and made it in furtherance of the conspiracy and other anticompetitive conduct here alleged.

74. Similarly, in an article dated December 8, 2016, titled "A Major Change has Occurred with Regard to New Dental Specialties," Ronald S. Brown, the former Secretary of the ABDS Board of Directors, commented that the ADA's consolidation of power allowed "existing specialties to lobby to prevent new and possibly competing specialties from becoming recognized." He wrote that "there is an inherent conflict of interest which reflects economic interests above those of patient care." Thus, Brown wrote: "It is hoped for that the ABDS will take over from the ADA with respect to emerging dental specialties,"

75. Upon information and belief, as a result of Defendants' efforts, dentists approved by ABDS-approved specialty certifying Member Boards are no longer prohibited from holding themselves out as specialists in at least six states. However, as discussed above and below, the

ABDS is hardly objective, independent, and impartial; and it has used the power imbued in it by state dental boards to protect the interests of the ABOI and the AAID, and has both restrained competition and preserved Defendants' unlawful monopolies in the process.

76.     Plaintiffs do *not* challenge Defendants' right to petition the courts, nor do Plaintiffs fundamentally quarrel with the sentiments expressed in the various statements and representations briefly summarized above.  To the contrary, had Defendants actually *behaved* in conformity with their high-minded and avowedly public-spirited rhetoric, Plaintiffs would be applauding, not suing.

77.     But the conduct of Defendants *after* they "won" the right to recognize specialty certifying boards shows that this was all a sham, a mere component of a broad plan, carefully conceived and executed, to engage in deceptive, anticompetitive, and monopolistic behavior.

**V.     Defendants Are Engaged in a Conspiracy To Prevent the USBOI and ICOI From Competing in the Implantology Specialty Markets.**

78.     Despite professing that the ABDS would be neutral, impartial, and objective, Defendants have in fact consistently engaged in anti-competitive conduct to harm the USBOI and its sponsoring organization, the ICOI, so that Defendants can block them—and any other actual or potential competitors—from entering the Implantology Specialty Markets.

79.     Upon information and belief, Defendants have attempted to influence and/or redirect Internet searches for the ICOI such that results of online searches for the term "ICOI" include the ABOI's website.  Specifically, the source code (or "metatags") of the ABOI website, as of at least September 25, 2018, included the term "ICOI" as a "keyword."  In the past, online search engines used such keywords to help them generate search results for particular search terms.  Upon information and belief, this reflects an intentional attempt to cause Internet searches for "ICOI" to return results for the ABOI website.

22

80.     This cannot have been accidental and has no competitive (or even fair) purpose: instead, it is a small, sorry action that further supports the existence of a broad, largely clandestine, conspiracy to employ a panoply of falsehoods, slander, and dirty tricks to feather Defendants' nests, deceiving their own actual and prospective members in the process.

81.     Upon information and belief, Defendants have also made false statements intended to prevent implantologists from considering seeking certification from the USBOI.  The Misch International Implant Institute (the "Misch Institute") was established in 1988 by renowned implantologist Carl E. Misch.  It offers continuing education in dental implants and prosthetics and attracts some of the strongest implantology students.  Upon information and belief, before even considering the USBOI's application for recognition as a specialty certifying board, Defendants have stated to one or more graduates of the Misch Institute that the USBOI will never be recognized as an organization capable of certifying oral implantology specialists.  In doing so, Defendants have discouraged those implantologists from becoming members of the USBOI and the ICOI, applying for recognition as specialists by them, and partaking in the programs offered by them.

82.     In August 2018—within days of Defendant Parker telling Plaintiffs that a revised application would be available—Defendant ABOI published its "Summer Newsletter." In that publication, Defendant O'Grady made unprompted, false, and disparaging remarks regarding the USBOI:

> There is a group named the United States Board of Oral Implantology (USBOI) that is stating that they are a certifying board in oral implantology.
>
> The ABOI/ID strongly opposes this group due to their infringement of our trademark as well as causing undue confusion to the public. The ABOI/ID takes offense that this group would state that they are a certifying body in the specialty of implantology without having

the experience, knowledge and history to administer a psychometrically and legally defensible examination. The process that everyone who is an ABOI/ID Diplomate has fought to preserve and have deemed a bona fide credential is being infringed upon by this groups existence. Should you find yourself being asked by others interested in board certification and the USBOI is mentioned, let them know that the ABOI/ID is the only bona fide credential in implantology.

83. Defendants' disparaging remarks and other improper actions to block the USBOI from competing with the ABOI occurred even as the USBOI has sought to become an ABDS-approved specialty certifying board in oral implantology in accordance with all ABDS procedures and requirements.

84. Defendants' response to the application submitted by the USBOI for recognition as a Member Board has made it even more clear that Defendants intend to prevent and suppress competition from the USBOI and ICOI: Defendants rejected the USBOI's application by retroactively withdrawing the ABDS' published instructions for such applications, stalling and delaying the release of revised instructions for eight months, and then releasing revised application instructions that state that the ABDS will not render any decisions regarding applications until January 2020, with an appellate process that is not fair, reasonable or time-limited.

85. All of these actions, and more that will be developed through discovery and further investigation, have been designed to cripple actual and potential competition, and to give Defendants an even longer period of unchecked monopoly and more months to make false, malicious, and defamatory statements about Defendants.

86. Here is the detailed chronology:

87. On or about January 22, 2018, the USBOI, submitted an application to the ABDS to become an ABDS Member Board. The USBOI completed its application based on the then-extant Original ABDS Application Instructions.

24

88. The Original ABDS Application Instructions set forth five criteria for certification as a dental specialty board:

> 1) Reflect a distinct and well-defined area of expertise in dental practice, above and beyond that provided at the level of pre-doctoral dental education, that is founded in evidence-based science, contributes to professional growth and education, and concerns the practice of dentistry.

> 2) Develop a rigorous standard of preparation and evaluation in the dental specialty area.

> 3) Provide evidence of psychometric evaluation of the written and oral examination processes for a period of time sufficient to ensure validity and reliability.

> 4) Provide an effective mechanism to maintain certification.

> 5) Exist as an independent, self-governing entity whose main purpose is to evaluate candidates for board certification.

89. The Original ABDS Application Instructions required the following information and documentation:

    a. a "definition of [the] dental specialty";

    b. a "background of history of the board";

    c. the applicant's "board documents";

    d. the applicant's "financial status";

    e. the "status of Advanced Education Programs";

    f. "current examination processes and eligibility criteria";

    g. "examination development and administration processes;

    h. "current composition of diplomates"; and

    i. "description of recertification process."

90. The Original ABDS Application Instructions also outlined an appeal process for incomplete or inadequate applications for dental specialty boards. It provided:

a. If the application is deemed incomplete, ABDS will send a letter outlining any perceived deficiencies after which the applicant board has thirty (30) days to respond and to address the deficiencies. Within ninety (90) days after receipt of the applicant board's response/additional information, ABDS will issue its decision.

b. Should the decision of ABDS be to deny the application, the applicant board may file a written appeal to the ABDS Executive Director within three (3) months after receipt of the denial. The applicant board may request reconsideration and may be granted an informal hearing with ABDS.

91. The USBOI's application satisfied all of the criteria set forth in the Original ABDS Application Instructions, and included an application fee of $7,500.

92. On or about February 22, 2018, the USBOI received a letter from Defendant Parker, copying Defendant Mashni, returning the USBOI's application and the $7,500 application fee. The letter advised that the ABDS had "suspended accepting applications pending a comprehensive update to the application form." The ABDS had provided no prior notice, on its website or otherwise, that it had suspended accepting applications. Defendant Parker wrote that "[o]nce the application form is finalized, we will distribute it to interested specialty boards." The letter noted that the USBOI's application indicated that the USBOI had downloaded the ABDS application from the ABDS website. It then asked: "Please let me know the specific URL address so that I can remove it."

93. On February 27, 2018, the USBOI responded to Defendant Parker, informing her that the USBOI had prepared the application based on information appearing on ABDS' "existing public website" at considerable cost to the USBOI. The USBOI asked if ABDS had published information on the withdrawal of the application and to forward any proof of such publication. It also asked whether ABDS was "withdrawing the specialty certifications already granted to several private organizations,"—namely, Defendant ABOI, and the other three ABDS-approved Member Boards.

94.    On March 11, 2018, Defendant Parker responded to the USBOI's February 27 letter, again copying Defendant Mashni.  The letter was basically doublespeak, suggesting that ABDS was "working on the application to clarify the intent and requirements of the criteria."  The letter further stated that a revised application would be "available within the next 2 months."  It did not address the USBOI's question regarding withdrawal of specialty certifications that the ABDS had granted previously, thus suggesting that the dilatory conduct was conceived for, and directed to, the USBOI.

95.    More than two months passed.  So, on May 21, 2018, the USBOI again wrote to Defendant Parker regarding ABDS' representations that it "expected to have a new credentialing 'application ready and available within the next 2 months.'"  The USBOI noted that more than two months had elapsed since the ABDS "made that representation, and no application has appeared, nor ha[s] [the ABDS] ever explained the summary withdrawal of the prior application, just after the USBOI relied on the extant form of application, completed it, and delivered it with the required processing fee."  The letter requested "an application delivered to the USBOI within fourteen (14) days."

96.    On June 7, 2018, the USBOI wrote to Defendant Parker noting that the ABDS had not "yet honored [its] promise from some months ago to produce and deliver to the USBOI a new form of credentialing application."  The letter requested that Defendant Parker "honor the personal commitment [she] made on behalf of ABDS to produce a credentialing application."

97.    On June 8, 2018, the USBOI received a response from Defendant Parker dated June 5, 2018.  The letter repeated the nonsense language from earlier correspondence, stating that the "ABDS continues to work on the application to clarify the intent and requirements of the criteria." The letter acknowledged that the ABDS "expected the application to be available in mid-May,"

but claimed that the "update process [was] taking longer than expected" without explaining why there had been such a delay. (Perhaps it was because Defendant O'Grady was still putting the finishing touches on the broadside he leveled against the USBOI in his "Summer Newsletter" article.)

98.     On or about July 2, 2018 the USBOI wrote to Defendant Parker, informing her that "if, by July 15, ABDS is unable to (a) deliver to USBOI a form of application for certifying board membership; (b) describe in detail the review process that ABDS will follow with respect to that application; *and* (c) commit to a date certain by which the application will be reviewed and acted upon, [the USBOI] shall proceed to a court of competent jurisdiction for relief."

99.     Struggling mightily to avoid litigation, the USBOI offered "to come to Chicago, provide any and all documentation [the ABDS] may require, and work with the ABDS to finalize the application and the review process, but only if given assurances that such a meeting would occur this month and would not just be another pretext for delay."

100.    On or about July 16, 2018, Defendant Parker responded to the USBOI in a letter copying Defendant Mashni, stating "that the [ABDS] Board of Directors is meeting on Saturday, July 21, 2018, to review the updated criteria and application." Defendant Parker further promised to "let [the USBOI] know the following week" when it could "expect the updated application."

101.    On or about July 19, 2018, the USBOI wrote to Defendant Parker asking for assurances that, "on or before July 27" the ABDS would supply:

>        (1) the long-requested, and long-promised, credentialing application; (2) a written statement of the criteria that ABDS will apply in reviewing the application that USBOI will promptly submit; and (3) written commitment, in your official capacity, of the date certain by which the application will be reviewed and a decision made and communicated to me and my clients.

102.    On July 26, 2018, Defendant Parker responded to the USBOI, copying Defendant

Mashni, and "advised that [the ABDS] Board of Directors is in the final stages of revising the dental specialty application and will distribute the application to all interested parties by the end of August."

103.    On August 24, 2018—*more than 8 months after rejecting the USBOI's application and promising that a new one would be forthcoming*—the ABDS sent the USBOI the Revised ABDS Application Instructions.

104.    The Revised ABDS Application Instructions include only marginal changes to the substantive requirements set forth in the Original ABDS Application Instructions for recognition as an ABDS Member Board (undermining any suggestion that the ABDS needed *eight months* basically to restate the words of its original instructions).  The ABDS meets the revised substantive requirements.  However, the Revised ABDS Application Instructions also include two procedural changes that further Defendants' conspiracy to preserve the ABOI's and AAID's unlawful monopoly and restraint on competition.

105.    First, the Revised ABDS Application Instructions state that "[a]ll applications and supporting materials are due by February 1 [2019] with final decisions made at the ABDS Winter meeting, typically held in January, the following year."  In other words, the ABDS will not even consider the USBOI's application until January 2020.  Of course, the USBOI submitted its first application on or about January 22, 2018, in advance of February 1, *2018*.  Thus, under the Revised ABDS Application Instructions, even if the USBOI submits a new application by February 1, 2019, the ABDS will not need to make a decision about the application until two years after the USBOI properly submitted its application under the then-existing guidelines.

106.    Second, the Revised ABDS Application Instructions provide for a more limited appeal of an application denial than that provided by the Original ABDS Application Instructions,

further insulating the ABDS' ability to protect the ABOI's monopoly in oral implantology specialty certification. The Revised Application Instructions allow for an appeal only "of procedural issues raised by appellants and no additional facts can be received or considered during the appeal." That stands in stark contrast to the Original ABDS Application Instructions, which allowed applicants to submit additional information if the ABDS determined that an application was incomplete or deficient, and then allowed for an appeal requesting reconsideration of a denial without limiting the scope of such appeal.

107. These actions reveal the hidden hands of the ABDS' sponsors (competitors to the USBOI and ICOI). They used their shills (the ABDS and its Executive Director) to: (1) delay even the prospect of competitive entry (by arbitrarily returning a fully-executed, paid, and compliant application, submitted by an entity that met *all* certifying criteria); (2) further delay entry, hiding behind false bases (or no bases at all) for months-long delays in preparing a new application; (3) crafting an application that they knew they could reject; (4) saying they would not even *consider* that doomed application until 2020; and (5) removing any meaningful ability to appeal.

108. These are not the actions of the friendly dentist on the corner; these are the clear-eyed works of conspirators and monopolists, whose behavior harms competition, injures Plaintiffs, and imperils the public trust.

## VI.    **The Effect of Defendants' Conspiracy**

109. It is critical for the USBOI, the ICOI, and dentists interested in being certified as specialists by the USBOI (including many ICOI members) that the USBOI is approved by the ABDS as a specialty certifying Member Board.

110. Without recognition by the ABDS as a specialty certifying Member Board, the

USBOI is improperly blocked from entering the Implantology Specialty Markets. Oral implantologists otherwise interested in being certified as specialists by the USBOI will not apply to be certified if the USBOI is not an ABDS-approved Member Board because the USBOI certification will not come with the benefits typically associated with being a specialist, such as the ability to (i) advertise to potential patients and other members of the dental industry as specialists; and (ii) charge increased amounts for performing implantology procedures and be reimbursed by insurance companies at increased rates.

111. Not only would lack of recognition as a specialty certifying Member Board affect the USBOI's ability to compete with the ABOI and the AAID for members, but it would also limit the USBOI's ability to compete as a provider of professional services associated with certifying dentists as oral implantology specialists (*e.g.*, continuing education courses, journal and other publication subscriptions, and conferences). The USBOI will lose membership dues, certification and re-certification fees, and revenue associated with the related services discussed above.

112. The ICOI will also suffer if the USBOI is not able to certify implantologists as specialists. USBOI members must also be ICOI members. Thus, a decrease in the USBOI's membership will have a direct impact on the ICOI's membership. Like the USBOI, the ICOI will lose membership dues, certification and re-certification fees, application fees, and revenue from professional services associated with certifying dentists as oral implantology specialists (*e.g.*, continuing education courses, journal and other publication subscriptions, and conferences).

## VII.   **Relevant Markets**

113. The relevant product markets at issue (that is, the Implantology Specialty Markets) are: (i) the market for certifying dentists as oral implantology specialists, and (ii) the markets to provide professional services associated with such certifications (*e.g.*, continuing education

31

courses, journal and other publication subscriptions, and conferences).

114. Both markets as defined markets represent lines of commerce and relevant product markets within the meaning of the Sherman Act. There are no effective or reasonable substitutes for being certified as a specialist in oral implantology. Nor are there effective or reasonable substitutes for the ancillary professional services associated with being certified as a specialist in oral implantology

115. The relevant geographic market for the Implantology Specialist Markets is the United States—a proper geographic market within the meaning of the Sherman Act.

116. The ABDS is the only organization capable of granting dental specialty certifying boards the authority to certify dentists as specialists in oral implantology. The ABOI is the only specialty certifying board in oral implantology that has been approved by the ABDS. Plaintiffs seek to compete fairly, on the merits, in the United States markets in the Implantology Specialty Markets.

## FIRST CAUSE OF ACTION
### (ALL DEFENDANTS)
### (CONSPIRACY IN VIOLATION OF 15 U.S.C. § 1)

117. Plaintiffs repeat and reallege Paragraphs 1 through 116 above as set forth here in full.

118. Defendants entered into, engaged in, and continue to engage in a combination or conspiracy in unreasonable restraint of trade in the Implantology Specialty Markets. Their conduct is anticompetitive and works as a restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

119. Defendants' unlawful conduct has had and will continue to have anticompetitive effects by protecting Defendants from competition in the Implantology Specialty Markets.

120. Nothing about Defendants' unlawful conduct promotes competition, let alone

promotes it to an extent that would outweigh the anticompetitive harm they are causing.

121.    As a result of Defendants' unlawful conduct, Plaintiffs have been directly harmed because the USBOI has been prevented from entering either defined market and because the ICOI has been prevented from meaningfully competing in the market to provide professional services associated with certifying dentists as oral implantology specialists (*e.g.*, continuing education courses, journal and other publication subscriptions, and conferences).

**SECOND CAUSE OF ACTION**
**(ALL DEFENDANTS)**
**(MONOPOLIZATION IN VIOLATION OF 15 U.S.C. § 2)**

122.    Plaintiffs repeat and reallege Paragraphs 1 through 121 above as set forth here in full.

123.    Defendants conduct constitutes the intentional and unlawful acquisition and maintenance of monopoly power in Implantology Specialty Markets, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

124.    Defendants obtained monopoly power by, among other acts, deceiving state legislators, judicial officers, and members of state licensing boards; threatening crippling litigation expenses; and claiming falsely that the ABDS would be a neutral, fair, objective arbiter.

125.    Defendants are unlawfully maintaining monopoly power through, among other actions, the conduct alleged above with regard to the USBOI's application to be accredited as an organization capable of certifying implantology specialists without a substantive basis for the denial.  Defendants further unlawfully maintained their monopoly by refusing to provide an updated application or a timely review of Plaintiffs' application.

126.    As a result of Defendants' unlawful conduct, competition has been foreclosed and Plaintiffs have been prevented from competing, fairly and on the merits, in the Implantology Specialty Markets.

### THIRD CAUSE OF ACTION
### (ALL DEFENDANTS)
### (DECEPTIVE TRADE PRACTICES IN VIOLATION OF 815 ILCS 510 § 2(a)(8))

127.    Plaintiffs repeat and reallege Paragraphs 1 through 126 above as set forth here in full.

128.    Defendants have repeatedly disparaged the services or business of Plaintiffs by making false or misleading representations of fact.  Defendants have falsely stated in a manner calculated to mislead oral implantologists that the USBOI does not have "the experience, knowledge and history" to administer an examination of implantology expertise; and they have urged ABOI/AAID members to tell other dentists interested in board certification that the USBOI is not a "bona fide credential."

129.    Defendants have also repeatedly stated to graduates from Misch Institute, among others, that USBOI will never be recognized as an organization capable of certifying oral implantology specialists.

130.    These statements, and myriad others made by all defendants, including, on information and belief, the Doe Defendants, have harmed and will continue to harm the number and quality of dentists seeking membership in, and certification by, the USBOI and ICOI, reducing Plaintiffs' revenue from professional services associated with certifying dentists as oral implantology specialists (*e.g.*, continuing education courses, journal and other publication subscriptions, and conferences).

### PRAYER FOR RELIEF

NOW WHEREFORE, Plaintiffs USBOI and ICOI pray this court to:

    a.  Declare that Defendants have engaged in a combination or conspiracy in unreasonable restraint of trade in violation of the Sherman Act, 15 U.S.C. § 1.

    b.  Declare that Defendants have engaged in unlawful anticompetitive conduct in

violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

c.  Declare that Defendants have engaged in unlawful conduct in violation of 815 ILCS 510 § 2(a)(8).

d.  Issue the following preliminary and permanent orders:

    i.  Order Defendants to terminate the anticompetitive conduct and ongoing conspiracy.

    ii.  Order Defendants to adjudicate, in good faith, Plaintiffs' application within 30 days and provide a written statement of reason for any denial of that application, and opportunity for appeal on the merits (including by submission of additional information or evidence, if Defendants' find that Plaintiffs' application is deficient in that regard).

e.  Award treble damages, in an amount to be determined at trial and that cannot now be adequately quantified before relevant discovery, under Section 4 of the Clayton Act, 15 U.S.C. § 15.

f.  Award Plaintiffs reasonable attorneys' fees and costs; and

g.  Grant such other relief as the Court deems appropriate.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a jury trial.

Dated:        September 25, 2018

LATHAM & WATKINS LLP


By /s/ Michael Lacovara
     Michael Lacovara (NY Bar No. 2363448)
     William Reckler (*pro hac vice* forthcoming)

     885 Third Avenue
     New York, New York 10022-4834
     Telephone: (212) 906-1200
     Facsimile: (212) 751-4864
     Email: Michael.Lacovara@lw.com
              William.Reckler@lw.com

     *Attorneys for Plaintiffs United States Board*
     *of Oral Implantology and International*
     *Congress of Oral Implantologists*