UNITED STATES BOARD OF ORAL
IMPLANTOLOGY, et al.,

        Plaintiffs,

        v.

AMERICAN BOARD OF DENTAL
SPECIALTIES, et al.,

        Defendants.

No. 18 CV 6520

Judge Manish S. Shah

## MEMORANDUM OPINION AND ORDER

Certifications help consumers assess products. In the market for dental services, specialty boards issue certifications to dentists that meet certain criteria, and patients use those certifications to identify qualified dentists. Right now, allegedly, the only organization issuing certifications to dentists in the United States that specialize in oral implantology is one of the defendants, the American Board of Oral Implantology. This board has in turn received a certification from another defendant, the American Board of Dental Specialties (a certifier of certifiers). The plaintiffs—two entities that also issue certifications—allege that the defendants' market stronghold violates both § 1 and § 2 of the Sherman Act. They add that the defendants have disparaged plaintiffs' goods in violation of the Illinois Uniform Deceptive Trade Practices Act. The defendants say that nothing is preventing the plaintiffs from issuing their own certifications, and there is nothing illegal about defendants' conduct. They move to dismiss the complaint in its entirety.

## I.    Legal Standards

A complaint must contain a short and plain statement that plausibly suggests a right to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009); Fed. R. Civ. P. 8(a)(2). In ruling on a motion to dismiss, although a court must accept all factual allegations as true and draw all reasonable inferences in the plaintiffs' favor, the court need not do the same for legal conclusions or "threadbare recitals" supported by only "conclusory statements." *Ashcroft*, 556 U.S. at 678, 80–82. The plaintiff must provide "more than labels" or "a formulaic recitation of a cause of action's elements," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), and the complaint must "contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." *Id.* at 562. When the allegations involve complex litigation, a "fuller set of factual allegations may be necessary to show that relief is plausible." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1083 (7th Cir. 2008).

## II.    Facts

People that need dental implants have imperfect information; they need a capable dentist but often lack the time and know-how to distinguish between a hack and a crackerjack. They might rely on someone else's opinion, especially if that someone is particularly skilled at telling the two apart. In the dentistry field, that someone could be a "specialty certifying board"; a group that issues certifications to dentists who meet certain criteria (and pay the required fee). *See* [1] ¶¶ 2–4.[1] The

---

[1] Bracketed numbers refer to entries on the district court docket.

more that patients trust the specialty certifying board, the more dentists value their certifications. *See id.*

Ordinarily, specialty certifying boards would compete based on the quality of the information they provide. But state governments have regulated this market by, among other things, restricting dentists' ability to advertise their certifications. [1] ¶¶ 3, 48. Many states prohibit advertising a dental certification unless it was issued by a specialty certifying board that has been approved by the American Dental Association. [1] ¶¶ 3, 11, 12, 48, 49.[2]

The defendants include three entities that have changed this regulatory landscape. [1] ¶ 63. The American Academy of Implant Dentistry is an Illinois corporation with its principle place of business in Suite 750B of a building in Chicago. [1] ¶ 31. The Academy provides continuing education and training opportunities to its members, hosts conferences, and publishes an industry newsletter. *Id.* The American Board of Dental Specialties is an Illinois corporation based in Suite 750C. [1] ¶ 29. Like the American Dental Association, the Board of Dental Specialties reviews and approves specialty boards that wish to issue certifications. [1] ¶ 29. Since its creation in 1967, it has only approved one board in the field of oral implantology: the American Board of Oral Implantology. [1] ¶¶ 30, 60. The American Board of Oral

---

[2] This is a simplification. *See* [1] ¶ 11. Historically, state dental boards delegated to the American Dental Association the power to "(i) determine which fields of dentistry qualify as specialties, and (ii) authorize specialty certifying boards to certify dentists as specialists within a given field." *Id.* The American Dental Association recognizes nine specialties, but oral implantology (the "field of dentistry dealing with the diagnosis, surgical placement, prosthetic reconstruction, and maintenance of dental implants," [1] ¶ 5) is not one of them. [1] ¶ 50.

Implantology is an Illinois corporation that issues certifications to dentists that practice oral implantology (and provides other continuing education services). [1] ¶ 30. It is based in Suite 750. *Id.*[3]

These entities' efforts to change the status quo included lobbying and litigation. [1] ¶¶ 12, 63, 65. In New Jersey, the American Board of Dental Specialties petitioned the state's board of dentistry to relax its advertising restrictions. [1] ¶ 65. Elsewhere, the Academy filed a lawsuit alleging that Indiana violated the Sherman Act when it delegated regulatory authority to the American Dental Association. [1] ¶ 69. There are other examples, the earliest of which dates back to 2010. *See* [1] ¶¶ 63, 64, 70, 71. In the process, the defendants told state legislatures and courts that, if granted the authority to approve specialty certifying boards themselves, they would be neutral and impartial. [1] ¶¶ 14, 70, 72.

Defendants have also sought to influence public opinion. *See* [1] ¶ 73. During an interview, the Academy's general counsel (Frank Recker) said that the Board of Dental Specialties would "not consider competition, political decisions, or turf wars," and that its decisions would not be "made by a group of competitors who could be economically or politically affected by their own decisions." [1] ¶ 73. Ronald Brown, the former secretary of the Board of Dental Specialties, wrote that "[i]t is hoped for

---

[3] The Academy chartered the American Board of Oral Implantology in 1967, [1] ¶¶ 6, 31, which in turn (along with three other professional organizations) formed the American Board of Dental Specialties in 2013. [1] ¶ 55. The Board of Dental Specialties then approved one of its creators, the Board of Oral Implantology, as a certifier of dentists in the field of implantology. [1] ¶ 30.

that the [Board of Dental Specialties] will take over from the ADA with respect to emerging dental specialties." *Id*. ¶ 74.

Their efforts have partially paid off: in at least six states, dentists are not restricted to advertising only ADA-approved certifications. [1] ¶¶ 13, 75; *see* footnote 8 below. Until one of them—Ohio—finishes amending its rules, dentists there can only advertise their certifications if they were issued by specialty certifying boards approved by either the American Dental Association or the American Board of Dental Specialties. [40] at 13 n.5.

The plaintiffs are in the business of oral implantology certifications, too. *See* [1] ¶ 7. Similar to the Academy, plaintiff International Congress of Oral Implantologists provides continuing education services. [1] ¶ 7. It also issues certifications to oral implantologists. [1] ¶ 44. In 2017, it formed plaintiff United States Board of Implantology, which wants to be approved by the American Board of Dental Specialties as a specialty certifying board (like the American Board of Oral Implantology) for dentists in the field of oral implantology. [1] ¶¶ 7, 45. It has designed its own rigorous process for determining whether an oral implantology specialist should receive a certification. [1] ¶ 46.

The United States Board of Oral Implantology set out to obtain that approval in early 2018. [1] ¶¶ 16, 87. It submitted an application to the American Board of Dental Specialties that, according to the complaint, satisfied all of the relevant criteria (and included the $7,500 filing fee). [1] ¶ 91. It heard back about a month later, when Cheryl Parker (the executive director of both the American Board of

Dental Specialties and the Academy) replied in writing (copying Dr. Michael Mashni, president of the American Board of Dental Specialties) to say that they had "suspended applications pending a comprehensive update to the application form." [1] ¶ 92. She also returned the filing fee. *Id*.

The United States Board of Oral Implantology demanded that the American Board of Dental Specialties complete the revisions quickly, [1] ¶¶ 21, 92–98, 100–102, and even offered to assist with the finalization of the application, [1] ¶ 99, but the revised form did not arrive for eight months. [1] ¶ 103. When it came, it included only minor changes to the substantive requirements of the original application, [1] ¶¶ 23, 88–89, 104, plus two procedural changes: (1) any new applications had to be submitted by February 1, 2019, and would not be considered until January of 2020, *id.* ¶¶ 24, 105, and (2) any appeals would be limited to procedural issues. *Id.* ¶¶ 25, 106. The defendants say the United States Board of Oral Implantology has not submitted a new application. [42] at 7.

The plaintiff's theory is that these actions harmed competition. They acknowledge that the defendants' lobbying and litigation efforts are protected, [1] ¶ 76, but say that the way they have exercised their authority shows it "was all a sham" meant to further "deceptive, anticompetitive, monopolistic behavior." [1] ¶ 77. They also allege that the defendants have constructively denied their application, and that the delay itself is harmful. *See* [1] ¶¶ 21, 84, 107; [40] at 18–19.[4] Again, they

---

[4] They add that the new review procedures "essentially ensure" that the American Board of Dental Specialties is able to "perpetually protect the [American Board of Oral Implantology's] status as the sole specialty certifying board in oral implantology." [1] ¶ 25.

allege that the intent was to protect the American Board of Oral Implantology's monopoly on certifying dentists as oral implantology specialists. *See* [1] ¶ 19. Without the approval of the American Board of Dental Specialties to issue certifications, the United States Board of Oral Implantology will have trouble attracting customers because its certifications will not come with the usual benefits (e.g., the ability to advertise the certification, charge more for performing procedures, and receive reimbursements from insurance companies at increased rates). [1] ¶¶ 16, 26, 51, 110. And, as a result, the United States Board of Oral Implantology will lose membership dues, certification fees, and revenues associated with providing other professional services. *Id.* ¶ 111. This in turn will affect membership in the International Congress of Implantologists, because members of the United States Board of Oral Implantology must also be members of the International Congress of Implantologists. [1] ¶ 112.

Lastly, plaintiffs allege the defendants have made false and misleading representations of fact. [1] ¶ 128. According to the complaint, defendants told graduates of a renowned implantology institute that the United States Board of Oral Implantology would never be recognized as an organization capable of certifying oral implantology specialists. [1] ¶ 81. The American Board of Oral Implantology also published a newsletter in which its president (Kevin O'Grady) said that the United States Board of Oral Implantology does not have "the experience, knowledge and history to administer a psychometrically and legally defensible examination." [1] ¶¶ 82, 128. O'Grady also allegedly urged members of the Academy to tell other

dentists that the United States Board of Oral Implantology "is not a 'bona fide credential.'" *Id*.

All of this—the constructive denial of the application, the lobbying and litigation, the statements to the press, and the creation of a "front organization" (presumably, the American Board of Dental Specialties), combined with the fact that the defendants are attempting to redirect internet traffic to their website by including the term "ICOI" in their website metatags—are, according to the complaint, part of a conspiracy to restrain trade and maintain a monopoly in the market for oral implantology specialty certifications. *See* [1] ¶¶ 1–2, 5, 79.

Plaintiffs define the relevant markets as follows: "(i) the market for certifying dentists as oral implantology specialists, and (ii) the markets to provide professional services associated with such certifications (e.g., continuing education courses, journal and other publication subscriptions, and conferences)." *Id*. ¶ 113. They allege that there are no effective or reasonable substitutes in either market, *id*. ¶ 114, and that the relevant geographic market is the United States. [1] ¶ 115.

## III.   Analysis

### A.   Ripeness

The claims are ripe. "A claim is unripe when critical elements are contingent or unknown." *Marusic Liquors, Inc. v. Daley*, 55 F.3d 258, 260 (7th Cir. 1995). Disputes over pending applications normally do not ripen until the application is denied. *See Hendrix v. Poonai,* 662 F.2d 719, 722 (11th Cir. 1981) (declining to address antitrust claims while doctor's application to be readmitted at a hospital was pending

because the complaint asked the court to deliver an "opinion advising what the law would be upon a hypothetical state of facts"); *MD Pharm., Inc. v. Drug Enf't Admin.*, No. 95-1474, 95-1475., 1996 WL 135318, at *1 (D.C. Cir. Feb. 2, 1996).

The allegations here are different. There is nothing pending; the application in question was returned without being approved. [1] ¶ 92. The defendants say this was not a denial of the application, *see* [34] at 15, but there is little difference between a denial and a declination to consider an application. And according to the complaint, it was all a ruse; their true intent was to permanently prevent the plaintiffs from entering the market. [1] ¶ 19; [40] at 18–19. The harm here includes the refusal to consider the application, and that sets this case apart from those where the only alleged harm is the anticipated denial of the application.

The return of the application is harm enough. Even if the plaintiffs had immediately submitted a new application under the revised guidelines, and even if the defendants had granted that application, plaintiffs still would have suffered a two-year delay. [1] ¶ 87–89, 105. *See also* [1] ¶ 21 ("[d]elay meant more money for the [Academy] and [American Board of Oral Implantology], and always maintained the prospect that the [United States Board of Oral Implantology] would simply go away, with competition indefinitely foreclosed"). Delays can violate the Sherman Act. *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.,* 441 U.S. 1, 37 (1979). Defendants' promises to abide by their new deadlines are better than nothing, but they cannot use those promises (and the possibility that the plaintiffs reapply) to manufacture a

"contingent future event[s] that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998).

This case is also different than *Clapper v. Amnesty Int'l USA*, where there was only a "highly speculative fear" that respondents would be injured. 568 U.S. 398, 401, 410 (2013). *See also Otrompke v. Hill,* 592 Fed. App'x 495, 498 (7th Cir. 2014) (plaintiff lacked standing to challenge constitutionality of rules governing admission to the Illinois bar when those rules were enacted after his original application had been denied, and when he declined to reapply). It is also not the harbinger that defendants make it out to be, *see* [42] at 8; deciding this dispute will have no bearing on standard application procedures. It will simply resolve whether defendants harmed competition when they prevented plaintiffs from entering the market. When "[t]he terms of the law are clear" and "their application straightforward," a claim is ordinarily ripe for decision. *Marusic Liquors, Inc.*, 55 F.3d at 260. This case is no exception.

### B.    Section 1 of the Sherman Act

Section 1 of the Sherman Act declares illegal "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. Since it takes two to conspire, agreements do not violate the act if they are between a parent and a wholly-owned subsidiary, *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 759, 769–770 (1984), or between "affiliated corporate entities [that] have a complete unity of interest." *D'Last Corp. v. Ugent*, 863 F.Supp. 763, 768 (N.D. Ill. 1994), *aff'd*, 51 F.3d 275 (7th Cir. 1995). The

deciding factor is whether the agreement results in the "sudden joining of two independent sources of economic power" that had been "previously pursuing separate interests." *Copperweld*, 467 U.S. at 770–71. "Substance, not form" controls. *Id.* at 760. *See also Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 195 (2010).

Defendants see a *Copperweld* problem, but only because they read the complaint too narrowly. *See* [34] at 17–18. There is no allegation that any one defendant is a wholly owned (or even partially owned) subsidiary of another. There is no explicit allegation that any of them share profits. Absent the alleged conspiracy, each would be independent decision makers pursuing related but distinct economic interests: the Academy's interests in obtaining new, dues-paying members would be distinct from the American Board of Dental Specialties interest in receiving new, fee-generating applications from hopeful specialty certifying boards, which would be distinct from the American Board of Oral Implantology's interest in receiving new, fee-generating applications from hopeful oral implantology specialists. *See* [40] at 26–27.[5] Insofar as the complaint alleges that they all operate "as a single enterprise with common actors and common goals," it alleges that the conspiracy is what unites them. *See* [1] ¶ 62.

---

[5] The complaint suggests, but does not quite allege, that in order to receive a certification from the American Board of Oral Implantology, dentists also must make payments to the Academy. *See* [1] ¶¶ 1, 4 (dentists seeking certifications "generally pay membership dues to their specialty certifying board and/or its sponsoring organization (such as the [Academy] or the [International Congress of Oral Implantologists])"). Assuming that is true, the Academy might have partially overlapping interests with the American Board of Oral Implantology (both the Academy and the American Board of Oral Implantology would receive more money if more dentists applied for certifications from the American Board of Oral Implantology). But partial overlap is not enough—there must be "complete unity." *D'Last*, 863 F.Supp. at 768.

There is a snag, but not a determinative one. The complaint is so caught up with showing that collusion is happening that it neglects to describe a time when it was not. That makes it hard to know whether the three defendants ever acted in accordance with their theoretically distinct economic interests. This problem is especially acute with the allegations against the American Board of Dental Specialties; the complaint makes it seem as though the sole reason for its formation was to further the already-existing conspiracy. *See, e.g.,* [1] ¶ 1 (the American Board of Dental Specialties is a "front organization" meant to "ensure only that members of the [Academy] and [the American Board of Oral Implantology] could receive the coveted (and financially valuable) specialist certification"); [1] ¶ 8 (the American Board of Dental Specialties is a "shill organization," and "*all along* the intention was for it to be nothing more than an instrument of monopoly maintenance and destruction of competition") (emphasis added). *See also* [1] ¶ 31 (the Academy chartered the American Board of Dental Specialties "to act as its 'specialty certifying board branch'").

If true, there might be a *Copperweld* problem in alleging that the American Board of Dental Specialties conspired with anyone. But the complaint also contains facts that suggest the American Board of Dental Specialties remains (or at least was, at some point) independent. *See* [1] ¶ 57 (the American Board of Dental Specialties website says that it is "an independent organization," and that such independence is necessary for the "objective evaluation and determination of specialty areas"). A complaint should not be dismissed just because it has an internal contradiction,

*Atkins v. City of Chicago*, 631 F.3d 823, 832 (7th Cir. 2011), and drawing all reasonable inferences in the plaintiff's favor, *Ashcroft*, 556 U.S. at 680–82, the American Board of Dental Specialties was at some point independent enough to be considered separate for purposes of *Copperweld*. The conspiracy was possible.

But just because the conspiracy was possible does not mean it has been plausibly alleged. Conspiracies to restrain trade can be proven by either direct or circumstantial evidence. *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 629 (7th Cir. 2010). The parties agree that there is no direct evidence here. *See* [40] at 20–21. Circumstantial evidence can be enough if it includes "a mixture of parallel behaviors, details of industry structure, and industry practices, that facilitate collusion." *Id*. at 627. Parallel behaviors include those which "would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties," and "conduct [that] indicates the sort of restricted freedom of action and sense of obligation that one generally associates with agreement." *Id*. (citing *Bell*, 550 U.S. at 557 n.4).

Plaintiffs' circumstantial case is thin. They cite two[6] instances of parallel conduct, neither of which is all that unusual. *See* [40] at 22. The first is the forming of the American Board of Dental Specialties. *Id*. Leaving aside the observation that this was an action taken by the American Board of Oral Implantology and three non-

---

[6] The defendants engaged in parallel litigation and lobbying, but the complaint admits that such conduct is exempt under the *Noerr-Pennington* doctrine. *See* [1] ¶ 76; *E. R. R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961); *United Mine Workers of Am. v. Pennington*, 381 U.S. 657 (1965).

defendants, [1] ¶ 55, forming an independent entity to serve as a body that approves specialty certifying boards is not an action so unusual or indicative of restricted freedom that it gives rise to an inference of an anticompetitive agreement.[7]

The only other allegedly parallel, non-protected action was the constructive denial of the United State Board of Oral Implantology's application. [40] at 22. But the complaint does not allege facts that suggest the defendants conspired together to accomplish that result; the American Board of Dental Specialties (along with defendants Parker and Mashni, discussed below) acted unilaterally. *See* [1] ¶ 86–106. The complaint says that their conduct "reveal[s] the hidden hands of [their] sponsors," [1] ¶ 107, but does not explain how or why. At most, one other application was denied without citation to a "legitimate, substantive" reason, [40] at 29 n.18, but without knowing the total number of applications, these two instances fail to raise the inference that the decisions were anything other than routine, independent decisions by the certifying entity.

The other allegations do not push the plaintiffs' theory from possible to plausible. Allegations about market share could be used to suggest a vertical conspiracy, but such allegations are more compelling in the horizontal-agreement context (when they are necessary to show the conspiracy could have been effective). In the context of a vertical agreement, the fact that the American Board of Oral Implantology has a 100% market share is at most consistent with the inference the

---

[7] That is, after all, fairly similar to what the International Congress of Oral Implantologists did when it formed the United States Board of Oral Implantology to serve as a body that approves certification applications from dentists.

plaintiffs seek to raise, rather than a necessary precondition; the defendants are in theory depending on the American Board of Dental Specialties to perpetuate the monopoly, so the fact that the American Board of Oral Implantology has power is beside the point. Nor is the market naturally "ripe for collusion," at least not for the reason the plaintiffs say it is. The complaint does not explain in what way the American Board of Dental Specialties needed either the Academy or the American Board of Oral Implantology to restrict access to the relevant market. *See* [40] at 23. If there was a profit-sharing arrangement, the American Board of Dental Specialties might need the American Board of Oral Implantology or the Academy to pass along the money it received from its applicants and members, respectively, but there is no such allegation. Nothing else about the market for certifications suggests it is uniquely suited to collusion (other than, perhaps, the fact that there are only a few entities—the ADA and the American Board of Dental Specialties—that are empowered to approve the boards that issue the certifications).

The defendants did make public statements critical of the United States Board of Oral Implantology, but those statements do not "endorse[] an industry strategy to reduce … output," or otherwise plausibly suggest concerted efforts to restrain trade. *Standard Iron Works v. ArcelorMittal*, 639 F.Supp.2d 877, 897 (N.D. Ill. 2009). They simply reflect the belief that the United States Board of Oral Implantology's product was inferior. And even if the defendants had the opportunity to collude because they shared office space, [40] at 23–24, those allegations are less compelling in the context of a vertical conspiracy when there are plenty of "legitimate reasons to exchange

information." *See Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 762 (1984). Taken together and as a whole, the allegations in the complaint fall short of plausibly suggesting a conspiracy.

For some of the defendants, the complaint is silent about their role in a conspiracy. Lozada is the vice president of the American Board of Oral Implantology, and has held positions at the Academy and American Board of Dental Specialties as well. [1] ¶ 36. Gowey is the director of the American Board of Oral Implantology and the secretary of the American Board of Dental Specialties. [1] ¶ 35. Together, the complaint alleges that they "directed" the conduct of the defendants, [1] ¶¶ 33–37, an accusation made somewhat more believable by the fact that they all shared office space. But that is it, and that is not enough. O'Grady is the president of the American Board of Oral Implantology (and a former president of both the Academy and the American Board of Dental Specialties). [1] ¶ 34. To the degree the complaint alleges that he was involved in the conspiracy, it ties his liability to the allegedly derogatory remarks he made in a summer newsletter. *See* [40] at 25; [1] ¶ 82. That, too, falls short of plausibly alleging that he conspired to violate the Sherman Act.

The complaint does not fare much better with the other individual defendants. First, directors of an organization cannot conspire with their organization—that is covered by *Copperweld*, 467 U.S. at 769 ("officers or employees of the same firm do not provide the plurality of actors imperative for a § 1 conspiracy")—so Cherly Parker did not conspire with either the American Board of Dental Specialties or the Academy because she is a director of both. [1] ¶ 33. And Dr. Mashni did not conspire with the

American Board of Dental Specialties because he is its president. [1] ¶ 37. At most, the complaint alleges that Parker participated in the denial of the United States Board of Implantology's application because she favored the Academy's interests over the American Board of Dental Specialties' interests. But a preference is not a suggestion of an agreement and is at most consistent with a conspiracy. *See, e.g. Iqbal,* 556 U.S. at 678 ("[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief"); *Standard Iron Works,* 639 F.Supp.2d at 900 ("[w]hile the complaint need not contain detailed 'defendant by defendant' allegations, it 'must allege that each individual defendant joined the conspiracy and played some role in it because, at the heart of an antitrust conspiracy is an agreement and a conscious decision by each defendant to join it'").

The Academy's alleged involvement is also minimal. It chartered the American Board of Oral Implantology in 1967, [1] ¶ 6, and almost fifty years later, engaged in protected lobbying and litigation. [1] ¶¶ 13, 70. "Generally," dentists have to make payments to both the specialty certifying board (the American Board of Oral Implantology) "and/or" its sponsoring organization (the Academy) in order to receive a certification, *see* [1] ¶¶ 1, 4, so the Academy may have had a motive for preserving the market share of the American Board of Oral Implantology. And it shared office space with the other defendants, so it had an opportunity. But nothing it did suggests an agreement to restrict competition; it was all either protected activity or innocuous

and consistent with competitive instinct. *In re Text Messaging Antitrust Litig.*, 630 F.3d at 629.

The allegations against the American Board of Oral Implantology are similarly modest. Allegedly, it has a monopoly in the market for oral implantology certifications. *See* [1] ¶ 5; [40] at 23. But it has that monopoly as a result of actions taken by a different entity (the American Board of Dental Specialties), and the complaint does not allege facts suggesting even basic details about the terms of an agreement the two might have shared. The complaint does allege that the American Board of Oral Implantology acted as "puppet-master" while pulling strings at the American Board of Dental Specialties, [1] ¶ 19, but neglects to include facts that elaborate on what, exactly, that means. It also shares office space with the other defendants and has overlapping leadership, [1] ¶ 62 (a)–(b), and one might imagine that its leaders sat down and agreed to restrict competition. But none of the Board of Oral Implantology's members played any role in the denial of the plaintiff board's application; Parker and Dr. Mashni are directors at the Academy and the American Board of Dental Specialties—not the American Board of Oral Implantology. [1] ¶¶ 33, 37. Again, their involvement in the conspiracy has not been plausibly alleged.

The allegations against the American Board of Dental Specialties are more detailed, but they also depict unilateral rather than parallel activity. According to the complaint, the American Board of Dental Specialties duped states into believing it would operate neutrally but then exercised its discretion to protect the American Board of Oral Implantologists' monopoly. *See* [1] ¶¶ 8, 30, 60 (the only specialty

certifying boards that the American Board of Dental Specialties has ever approved are the four boards that helped found it). The American Board of Dental Specialties was also the only entity directly involved in the pretextual, constructive denial of the United States Board of Oral Implantology's application. [1] ¶ 107. As far as cooperation, the complaint again alleges that it met and conspired with other entity defendants behind closed doors in Suite 750 of a building in Chicago, and that it was particularly easy to do so because the defendants have overlapping leadership. [1] ¶ 62 (a)–(b). Cooperation was possible but not plausible.

Even if the complaint had sufficiently alleged a conspiracy, it does not allege a cognizable restraint on trade. "There can be no restraint of trade without a restraint." *Schachar v. Am. Acad. of Ophthalmology, Inc.*, 870 F.2d 397, 397 (7th Cir. 1989). Similarly, "'when a trade association provides information' (by giving its approval in that case, its disapproval in this case) 'but does not constrain others to follow its recommendations, it does not violate the antitrust laws.'" *Lawline v. Am. Bar Ass'n,* 956 F.2d 1378, 1383 (7th Cir. 1992); *Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*, 998 F.2d 391, 396 (7th Cir. 1993) ("the failure of a private, standard-setting body to certify a product is not, by itself, a violation of § 1" of the Sherman Act); *Patel v. Am. Bd. of Psychiatry & Neurology, Inc.,* No. 89 C 1751, 1989 WL 152816, at *3 (N.D. Ill. Nov. 21, 1989); *Consol. Metal Prod., Inc. v. Am. Petroleum Inst.*, 846 F.2d 284, 292 (5th Cir. 1988) ("a trade association that evaluates products and issues opinions, without constraining others to follow its recommendations, does not per se violate section 1 when, for whatever reason, it fails to evaluate a product favorably to

the manufacturer"). "This is so even where the organization at issue has a towering reputation." *Lawline*, 956 F.2d at 1384. *See also Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 736 (7th Cir. 2004) ("vertical exclusive distributorships … are presumptively legal").

The market and product alleged here make this like other cases involving professional-association endorsements. *See Schachar*, 870 F.2d at 397; *Lawline*, 956 F.2d at 1384. If the certifying entity lacks the power to prevent (or has not prevented) the professional from practicing without a certification, there has been no antitrust violation. Here, plaintiffs represent a type of rival certifier suing the group that issues a certification that plaintiffs would like to have. But the defendants have not prevented any dentists from practicing implantology and they have not prevented plaintiffs from issuing their own certifications. And they lack the authority to prevent dentists from advertising those certifications once they are issued.

The lack of restraint is apparent. According to the complaint, in forty-four states, dentists cannot advertise any certifications, and in six, dentists can advertise certifications that are backed by specialty certifying boards approved by the American Board of Dental Specialties. [1] ¶ 75. Absent is an allegation that dentists in those six states cannot also advertise certifications issued by the United States Board of Oral Implantology.[8] At most, in Ohio, there are restraints on advertising

---

[8] The motion to dismiss cites state statutes, federal case law and other administrative rules showing that, in at least five of those remaining states, dentists can advertise certifications from the United States Board of Oral Implantology as freely as they can advertise certifications by the American Board of Oral Implantology. [34] at 23.

certifications issued by plaintiffs that do not apply equally to certifications issued by defendants (and, apparently, those restrictions are temporary). *See* [34] at 23. But even then, the culprit is the Ohio state government, not the defendants.

There are no other restraints occurring in the markets set out in the complaint. The plaintiffs say that the restraints are occurring in "(i) the market for certifying dentists as oral implantology specialists, and (ii) the markets to provide professional services associated with such certifications (e.g., continuing education courses, journal and other publication subscriptions, and conferences)." [1] ¶ 113. But they have failed to allege any restraint that prevents them from certifying dentists as oral implantology specialists and providing related professional services. Trade in that market occurs when dentists pay application fees to specialty certifying boards, and specialty certifying boards consider the dentists' credentials and, if justified, issue the certification. The defendants cannot prevent (and have not prevented, judging from the allegations in the complaint) dentists from paying an application fee to the United States Board of Oral Implantology in return for one of its certifications.

The American Board of Dental Specialties has the power to place (or decline to place) its seal of approval on a specialty certifying board. So if the defendants have restrained trade, they have done so in a different market: that for issuing certifications that are backed by the American Board of Dental Specialties. The problem is that "[p]roduct markets are not defined in terms of one trademark or another." *Generac Corp. v. Caterpillar Inc.*, 172 F.3d 971, 977 (7th Cir. 1999). For the

same reason, the product market cannot be defined here in terms of the backing of the American Board of Dental Specialties.

The plaintiff's alleged harms derive from the defendants' "towering reputation," another give-away that this is not an antitrust violation. *Lawline*, 956 F.2d at 1384. The theory is that dentists will not value the plaintiffs' certifications if they are not backed by the American Board of Dental Specialties, and that this will cause the American Board of Oral Implantology to lose members (which will in turn cause the International Congress of Implantologists to lose members, too). [1] ¶¶ 111, 112. But that is just another way to say that the source of the harm is the American Board of Dental Specialties' reputation, and that is not enough. The § 1 claims are dismissed.

## C. Section 2 of the Sherman Act

Section 2 of the Sherman Act prohibits monopolization. 15 U.S.C. § 2. There are two elements to a claim under § 2: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966). When the plaintiff is a private party, it must also show that "the monopolization caused 'injur[y].'" *Comcast Corp. v. Behrend,* 569 U.S. 27, 43 (2013).

The complaint alleges that all of the defendants violated § 2 of the Sherman Act, but only identifies one that has monopoly power: the American Board of Oral Implantology. *See* [40] at 22–23. The implication, albeit it one not explicit in the

complaint, is that the remaining defendants conspired to monopolize the market for certifying dentists as oral implantology specialists. *See* [1] ¶¶ 123–126. But the complaint adds no facts related to the conspiracy that are specific to the monopolization claim, *see id.*, and fails to adequately allege a conspiracy under § 1, *see above*, so the complaint fails to allege facts that make it plausible that defendants conspired to monopolize the relevant market or willfully engaged in anticompetitive conduct. The § 2 claims against the defendants, other than the Board of Oral Implantology and Board of Dental Specialties, are dismissed. Even if the American Board of Dental Specialties did not possess monopoly power in the relevant market, they were at least in a position to help the American Board of Oral Implantology obtain it, so it is possible they combined or conspired to monopolize.

The parties agree that the plaintiffs must adequately allege a restraint applicable to the "relevant market." *Republic Tobacco Co.*, 381 F.3d at 738. The relevant market consists of both "a product and a geographic dimension," *id.*, and is "comprised of those 'commodities reasonably interchangeable by consumers for the same purposes.'" *Fishman v. Estate of Wirtz,* 807 F.2d 520, 531 (7th Cir. 1986). *See also Queen City Pizza, Inc. v. Domino's Pizza, Inc.,* 124 F.3d 430, 436 (3d Cir. 1997) ("[w]here the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable

substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted").

Plaintiffs have adequately alleged that sellers in the market for certifying dentists as oral implantology specialists reach consumers across the United States. Each individual state may restrict the ability to advertise those certifications, [34] at 26, but the certifications have value beyond the dentists' ability to advertise them (for instance, dentists can charge more if they have certain certifications, [40] at 33). The certifications are not geographically limited, either (i.e., they indicate to consumers that the recipient has qualifications that are valuable in any state). *See* [40] at 32. Their relevant geographic market is the United States.

But there is no plausible market power in an appropriate product market. "If rivals may design and offer a similar package for a similar cost, there is no barrier, and without a barrier there is no market power." *Will v. Comprehensive Accounting Corp.*, 776 F.2d 665, 672 (7th Cir. 1985). "[T]he power to control a given market's total output" is "a necessary prerequisite to obtaining power over price or monopoly power," and if there is no power to control output, "it matters little that high barriers to entry might exist to help that firm maintain monopoly power it could never achieve." *Indiana Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1415 (7th Cir. 1989). But at least in the "market for certifying dentists as oral implantology specialists,"[9]

---

[9] The defendants might have limited output in "the market for certifications issued by specialty certifying boards that were approved by the American Board of Dental Specialties." But that is not the market alleged in the complaint. And again, "[p]roduct markets are not defined in terms of one trademark or another." *Generac Corp.*, 172 F.3d at 977. *See also Kaiser Aluminum & Chem. Corp. v. F.T.C.*, 652 F.2d 1324, 1330 (7th Cir. 1981) ("well-defined submarkets may exist which, in themselves, constitute product markets for antitrust

there is nothing preventing the plaintiffs from designing and offering a similar certification, in part because the plaintiffs have not alleged that there is anything enabling the defendants to limit the market's total output.

The complaint fails to allege monopoly power in the second market for similar (and additional) reasons. The second market is derivative of the first, *see* [1] ¶ 113 (the "markets to provide professional services associated with such certifications (e.g., continuing education courses, journal and other publication subscriptions, and conferences)"), so if there is no market power in the first market, there is none in the second market, either. It is also too vague to satisfy even the more modest pleading standards for non-conspiracy claims; it identifies at least four examples of products that might be sold in that market, and acknowledges the list is incomplete. *Hooper v. Proctor Health Care Inc.*, 804 F.3d 846, 851 (7th Cir. 2015) (the plaintiff must plead "sufficient facts to put [the defendant] on notice of his claim"); *Republic Tobacco Co.*, 381 F.3d at 738 (the plaintiff must "precisely establish a relevant market"). Further, the complaint also alleges that other entities (notably, the American Dental Association and the International Congress of Oral Implantology) are currently providing such professional services, and there is no allegation that any defendant has monopoly power in that market.

---

purposes," but the "boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors").

The complaint also does not allege any anticompetitive conduct. "Antitrust law does not compel your competitor to praise your product or sponsor your work," *Schachar*, 870 F.2d at 399 (7th Cir. 1989), and even false statements do not amount to anticompetitive conduct because they do not curtail output—they just "set the stage for competition in a different venue: the advertising market." *Sanderson v. Culligan Int'l Co.*, 415 F.3d 620, 623 (7th Cir. 2005). None of the defendants' alleged statements suffice as anticompetitive conduct, *see, e.g.*, [1] ¶¶ 13–14, 63–77, 81–83, even when taken in combination with the alleged power that the American Board of Dental Specialties has to approve specialty certifying boards. *Sanderson*, 415 F.3d at 624 ("[c]ommercial speech is not actionable under the antitrust laws"). With regards to the denial of the application, the defendants were free to decline to deal with the plaintiffs. *See United States v. Colgate & Co.,* 250 U.S. 300, 307 (1919). Plaintiffs' § 2 claim is dismissed.

## D.     The Illinois Uniform Deceptive Trade Practices Act

Diversity jurisdiction exists over plaintiffs' state-law claim. The plaintiffs are citizens of New Jersey and Washington D.C., and the defendants are citizens of Illinois, Ohio, Wisconsin and California. [1] ¶¶ 27–38; 28 U.S.C. § 1332.[10]

---

[10] The complaint also lists fifty unnamed Doe defendants "whose identities and roles will be developed through discovery and Plaintiffs' independent investigations." [1] ¶ 38. Normally, "'John Doe' defendants are not permitted in federal diversity suits" because "the existence of diversity jurisdiction cannot be determined without knowledge of every defendant's place of citizenship." *Howell by Goerdt v. Tribune Entm't Co.,* 106 F.3d 215, 218 (7th Cir. 1997). But "[a]n exception applies when the John Does are nominal parties—nothing more than placeholders 'in the event that during discovery [the plaintiff] identifie[s] any additional defendants he wishe[s] to add to the suit." *Pain Ctr. of SE Indiana LLC v. Origin Healthcare Sols. LLC*, 893 F.3d 454, 459 (7th Cir. 2018) (citing *Moore v. Gen. Motors Pension Plans*, 91 F.3d 848, 850 (7th Cir. 1996)) ("[t]he 150 John Does are mere placeholders, so we can safely

Under Illinois law, "[a] person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation, the person: (8) disparages the goods, services, or business of another by false or misleading representation of fact." 815 Ill. Comp. Stat. Ann. 510/2. Neither party disputes that this claim sounds in fraud and must be alleged with particularity. Fed. R. Civ. P. 9(b); *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 506–07 (7th Cir. 2007); [34] at 33; [40] at 40. That is, the complaint must allege "the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Uni*Quality, Inc. v. Infotronx, Inc.*, 974 F.2d 918, 923 (7th Cir. 1992).

The misrepresentation must be sufficiently tied to Illinois. In order to state a claim under a similar act (the Illinois Consumer Fraud and Deceptive Practices Act, 815 Ill. Comp. Stat. Ann. 505/1 *et seq.*), a plaintiff must allege that the statements in question occurred "primarily and substantially in Illinois." *Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill.2d 100, 187 (2005) ("there is no single formula or bright-line test for determining whether a transaction occurs within this state" under 815 Ill. Comp. Stat. Ann. 505/1 *et seq.*).[11] Illinois courts have considered "the place where a

ignore them for purposes of diversity jurisdiction"). The Doe defendants in the complaint are "mere placeholders," so "jurisdiction is secure." *Id.*

[11] Other courts have applied this rule to the Illinois Uniform Deceptive Trade Practices Act. *See, e.g., Underground Sols., Inc. v. Palermo,* No. 13 C 8407, 2014 WL 4703925, at *10 (N.D. Ill. Sept. 22, 2014); *Purepecha Enterprises, Inc. v. El Matador Spices & Dry Chiles*, No. 11 C 2569, 2012 WL 3686776, at *15 (N.D. Ill. Aug. 24, 2012); *Maui Jim, Inc. v. SmartBuy Guru Enterprises*, No. 1:16 CV 9788, 2018 WL 509960, at *5 (N.D. Ill. Jan. 23, 2018) ("[a]lthough the [U]DTPA does not contain text expressly confining its application to events or circumstances arising in Illinois, there is a 'long-standing rule of construction in Illinois

company policy is created or where a form document is drafted" to be relevant to whether a statement or transaction occurred "primarily and substantially in Illinois." *Avery,* 216 Ill. 2d at 187. They have also found relevant the location "where the injury or deception took place." *Int'l Profit Assocs., Inc. v. Linus Alarm Corp.*, 2012 IL App (2d) 110958, ¶ 11. *See also Specht v. Google, Inc.,* 660 F.Supp.2d 858, 866 (N.D. Ill. 2009) ("[c]ourts consider several factors to determine whether a transaction occurred 'primarily and substantially' in Illinois, bringing a claim under the ambit of the [Illinois Uniform Deceptive Trade Practices Act], including: (1) the plaintiff's residence, (2) where the misrepresentation was made, (3) where the damage to the plaintiff occurred, and (4) whether the plaintiff communicated with the defendant in Illinois"); *Shaw v. Hyatt Int'l Corp.*, No. 05 C 5022, 2005 WL 3088438, at *2 (N.D. Ill. Nov. 15, 2005), *aff'd*, 461 F.3d 899 (7th Cir. 2006). In addition, a claim will lie "when the quality of [one's] goods or services is attacked," *Allcare, Inc. v. Bork*, 176 Ill.App.3d 993, 1000 (1st Dist. 1988), but not when the statement was an "expression[s] of opinion." *Soderlund Bros. v. Carrier Corp.*, 278 Ill.App.3d 606, 620 (1st Dist. 1995) ("[m]atters of fact are distinguishable from expressions of opinion").

The complaint alleges that all defendants violated the Illinois Uniform Deceptive Trade Practices Act, but cites only a few statements, leaving most of the defendants out of the claim entirely. [1] ¶¶ 127–130. First, the complaint alleges that the American Board of Oral Implantology published a newsletter in which O'Grady

---

which holds that a 'statute is without extraterritorial effect unless a clear intent in this respect appears from the express provisions of the statute'").

was quoted as saying that the United States Board of Oral Implantology does not have the "experience, knowledge and history to administer a psychometrically and legally defensible examination." [1] ¶ 82. In the same newsletter, O'Grady said that the American Board of Oral Implantology is the "only bona fide credential in implantology." *Id*. Those statements are specific enough under Federal Rule of Civil Procedure 9(b); the allegation includes "the identity of the person making the misrepresentation" (O'Grady and the American Board of Oral Implantology), the time, place, and content of the misrepresentation" (a summer, 2018 newsletter) and "the method by which the misrepresentation was communicated to the plaintiff" (publication). *Uni\*Quality, Inc.*, 974 F.2d at 923. The statements were phrased conclusively and without reference to probabilities or the possibility that O'Grady was incorrect; they were not phrased as opinions. And while a statement must be disparaging of the quality of a plaintiffs' goods, *Allcare, Inc.*, 176 Ill.App.3d at 999, here, the goods in question are in part derivative of the plaintiffs' reputation, so it is enough to allege that the statements disparaged the plaintiffs themselves.

But the complaint does not adequately allege that this statement occurred "primarily and substantially" in Illinois. True, the American Board of Oral Implantology is an Illinois corporation with its headquarters in Chicago, [1] ¶¶ 30, 60, and the location where a document is drafted is relevant. O'Grady resides in Ohio and serves as president of the American Board of Oral Implantology. [1] ¶ 34. But the complaint does not allege where the newsletter was published, or whether its readers were located "primarily and substantially" in Illinois. [1] ¶ 82. That makes it too

speculative to infer where the damage (and where the misrepresentation) actually occurred.

Second, the complaint alleges that the "defendants" told graduates of Misch Institute that "the USBOI will never be recognized as an organization capable of certifying oral implantology specialists." [1] ¶ 81. This allegation is not particular enough; it does not allege who said it or where they were located at the time. *Uni\*Quality, Inc.*, 974 F.2d at 923. The complaint also fails to allege that this statement was made "primarily and substantially in Illinois." *Avery*. 216 Ill.2d at 187.

The complaint also alleges that there were "myriad other [statements] made by all defendants, including, on information and belief, the Doe Defendants." [1] ¶ 130. But these allegations are insufficient to meet the pleading requirements under Rule 9(b), and they also fail to allege that they were made primarily and substantially in Illinois. The complaint does not identify any other statements[12] particularly enough to survive the motion to dismiss, either; that count of the complaint is dismissed in its entirety.

---

[12] Plaintiffs attached to their opposition an email that the Academy sent to its members saying it was the "only organization that serves implant dentists." [40-5] at 2. But even if misleading, the statement is not disparaging to the plaintiffs' goods or services; it does not even mention them. *See* 815 Ill. Comp. Stat. Ann. 510/2.

## IV.    Conclusion

Defendants' motion to dismiss is granted. All dismissals are without prejudice.

*See Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Indiana,* 786

F.3d 510, 519 (7th Cir. 2015). A status hearing is set for June 28, 2019, at 9:30 a.m.

ENTER:

Manish S. Shah
United States District Judge

Date:  May 30, 2019